UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| THOMAS D. REGEN, | ) |
| Plaintiff, | ) )  ) |
| v. | ) No. 1:14-cv-143 ) Magistrate Judge Brown ) **Jury Demand** |
| GILES COUNTY, TENNESSEE BOARD OF EDUCATION, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM

Pending before the Court are cross-motions for summary judgment. (Docket Entries 21 and 28). For the following reasons, the cross-motions for summary judgment are **DENIED**.

### I.  Statement of the Case

This action was initiated on November 7, 2014, when the Plaintiff filed a complaint alleging that the Defendant violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA") when it terminated the Plaintiff from a school bus driver training program and declined to hire the Plaintiff as a substitute school bus driver. (Docket Entry 1).

The Defendant employs school bus drivers as well as substitute drivers. (Docket Entry 36 ¶ 1). "[T]o become a school bus driver, one must pass a background check, pass a Department of Transportation (DOT) physical, receive a Homeland Security certificate with proof of residency, provide one's original birth certificate and pass [an] examination in order to receive a learner's permit for a CDL driver license." (Docket Entry 40 ¶ 14). Additionally, substitute bus driver applicants must pass a road test. (Docket Entry 40 ¶ 18). The individual can begin training after receiving a learner's permit. (Docket Entry 40 ¶ 15). Although Giles County offers a training program, it is not the only entity that offers such training. (Docket Entry 36 ¶ 2) (Docket Entry

1

40 ¶ 16). Bus drivers, including substitute drivers, must be able to perform an emergency exit. (Docket Entry 40 ¶ 20). Annually, Giles County requires its bus drivers and substitute drivers to perform three evacuation drills. (Docket Entry 40 ¶ 21).

As a result of the Plaintiff's medical condition, several toes and part of the Plaintiff's feet were amputated in 2008. (Docket Entry 36 ¶ 5) (Docket Entry 40 ¶ 1-4). The Plaintiff now "walks with a limp and is unsteady and uneven in his gait" and cannot walk or stand for longer than an hour at a time. (Docket Entry 36 ¶ 5). At times, the Plaintiff wears prescription supports in his shoes and a hard plastic boot. (Docket Entry 36 ¶ 5). Though the Plaintiff receives social security disability benefits, he is permitted to earn supplemental income. (Docket Entry 36 ¶ 6). The Plaintiff is not restricted in his ability to push, pull, lift overhead, and drive a vehicle. (Docket Entry 36 ¶ 7). The Plaintiff has a college degree and has prior experience driving school buses. (Docket Entry 36 ¶ 3).

The Plaintiff applied to work as a substitute school bus driver for the Defendant and was admitted into the Defendant's training program in March 2013. (Docket Entry 36 ¶ 4, 8). At this time the Plaintiff walked with a limp and told the Defendant that he was disabled. (Docket Entry 36 ¶ 10). Specifically, the Plaintiff told Danny Hickman, the Director of Transportation for the Giles County School Board, that he was disabled and on disability and told Mike Campbell, a trainer, that he was drawing disability. (Docket Entry 34 ¶ 2) (Docket Entry 36 ¶ 11, 13).

As required by the Defendant's training program and hiring process, the Plaintiff passed a DOT physical examination. (Docket Entry 36 ¶ 15). The Plaintiff then obtained a learner's permit to drive a school bus. (Docket Entry 36 ¶ 17). He also passed a written examination and completed the first step of training, performing pre-trip inspections. (Docket Entry 43 ¶ 7) (Docket Entry 40 ¶ 32). Mr. Campbell reported to Ms. Busby, the Pupil Transportation

Administration Assistant for the Giles County School Board, and Mr. Hickman that the Plaintiff had a difficult time getting around and noted that the Plaintiff took longer than usual to walk to the bus, board it, and get into his seat. (Docket Entry 33 ¶ 2) (Docket Entry 40 ¶ 35, 37). Ms. Busby observed the Plaintiff have a difficult time getting around the parking lot. (Docket Entry 40 ¶ 36). In April 2013, Mr. Hickman asked the Plaintiff if his disability would interfere with his ability to evacuate children from the bus, to which the Plaintiff said it would not. (Docket Entry 40 ¶ 39-41).

Mr. Hickman subsequently instructed Mr. Campbell to conduct evacuation drills with the Plaintiff. (Docket Entry 40 ¶ 42). There is some dispute as to whether Mr. Campbell conducted these drills with the Plaintiff. (Docket Entry 40 ¶ 43-44). According to the Plaintiff, Mr. Campbell mentioned that sometime during the school year he would need to demonstrate evacuation procedures in front of school administrators but that he had not been taught the procedures for evacuating a school bus and had not been instructed on the time requirements for evacuating a school bus. (Docket Entry 30-10, p. 23). The Plaintiff testified "the only thing I can think of is the two times that on my own I opened the back door and climbed in to the bus, back of the bus from the ground outside." (Docket Entry 30-10, p. 23). The Plaintiff noted that he "wasn't real fast with it but, you know, first two times you do something how fast are you?" (Docket Entry 30-10, p. 23). Mr. Campbell declared that he explained the evacuation procedures to the Plaintiff and noticed that the Plaintiff had difficulty completing the task. (Docket Entry 35 ¶ 5). Whereas it took the Plaintiff approximately five to seven minutes to exit the bus through the rear door, Mr. Campbell endeavors to have drivers complete evacuation drills in three minutes or less. (Docket Entry 35 ¶ 6-7). The Plaintiff was not given the opportunity to conduct a real evacuation drill with a bus full of children. (Docket Entry 43 ¶ 12).

On April 15, 2013, the Plaintiff was removed from the training program and employment consideration due to Mr. Hickman's belief that the Plaintiff could not effectively perform emergency evacuation procedures and was "too big a risk." (Docket Entry 36 ¶ 19, 22, 29) (Docket Entry 40 ¶ 48, 50). The decision was made without asking the Plaintiff about his mobility issue, without reviewing the Plaintiff's medical records, and without requesting or reviewing any medical tests. (Docket Entry 36 ¶ 30-32). The Plaintiff did not request accommodations because he did not believe he needed accommodations to perform the job. (Docket Entry 40 ¶ 51).

Joe Mitchell and Penny Mitchell began training around the same time as the Plaintiff. (Docket Entry 42 ¶ 9). They received their commercial driver's licenses in June 2013 and were placed on the list of substitute drivers in August 2013. (Docket Entry 42 ¶ 10). Mr. Mitchell performed a mock school bus evacuation drill on September 26, 2013. (Docket Entry 30-8). The parties have not established the date that Ms. Mitchell performed such a drill.

The Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 29, 2013, alleging discrimination based on his disability. (Docket Entry 37-1, p. 4-5). The EEOC issued the Plaintiff a dismissal and notice of rights on August 14, 2014, and the Plaintiff filed his complaint on November 7, 2014. (Docket Entries 1 and 1-1).[1] The parties consented to have the Magistrate Judge preside over the case. (Docket Entries 10 and 11). The Defendant and the Plaintiff filed cross-motions for summary judgement

---

[1] The Defendant acknowledges that it inadvertently submitted a false statement to the EEOC in response to the charge of discrimination. (Docket Entry 36 ¶ 34). The Defendant explained to the EEOC that the Plaintiff had not been hired or kept in the training program, in part, because "[t]he trainers expressed concerns of the problems the charging party was having with depth perception when driving, nervousness, and mobility." (Docket Entry 30-3, p. 3). While the Defendant states it had concerns with the Plaintiff's mobility, it did not actually have concerns with the Plaintiff's depth perception or nervousness. (Docket Entry 36 ¶ 34). It is unclear whether the Defendant corrected its misstatement with the EEOC.

on January 19, 2016. (Docket Entries 21 and 28). The motions have been fully briefed and are ripe for a decision.[2]

## II. Standard of Review

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This may be established by citations to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). While all reasonable inferences are drawn in favor of the non-moving party, the ultimate question is whether a genuine issue for trial remains. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (citations omitted).

## III. Analysis

This case presents a single issue: did the Defendant violate the ADA when it terminated the Plaintiff from its training program and declined to hire the Plaintiff as a substitute bus driver? The ADA is intended to "address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). It is unlawful for covered entities to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a).

To recover under the ADA, a plaintiff must ultimately establish that "(1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability."

---

[2] As an initial matter, counsel are reminded to comply with Local Rule 7.03(a) which requires that "[a]ll pleadings, motions, briefs, and all other papers prepared by counsel and presented for filing . . . shall be numbered at the bottom." The motions, briefs, and exhibits submitted in support of summary judgment are not paginated.

5

*Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (citation omitted); *see also Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). The causal phrase "because of" has been construed to mean that the individual's disability must be a "but-for" cause of the adverse employment action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012). An ADA claim may be established with direct or indirect evidence of discrimination. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004) (citation omitted).

There is some confusion in this Circuit as to the elements of a *prima facie* case of employment discrimination under the ADA. The Court in *Whitfield v. Tennessee*, 639 F.3d 253 (6th Cir. 2011) addressed the competing *prima facie* standards found in Sixth Circuit opinions, stating:

> There has been some confusion in this circuit as to the proper test for establishing a *prima facie* case of employment discrimination under the ADA. Although several cases lay out [five] elements ["1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced"] . . . , others . . . require that a plaintiff show "(1) that he or she is an individual with a disability; (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, and (3) who was discharged solely by reason of the disability." *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (citing *Monette,* 90 F.3d at 1178). This three-element test ("*Mahon* formulation") for a *prima facie* case is clearly inconsistent with the five-element test described *supra* ("*Monette* formulation").
>
> *Monette* states the proper test. Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). In this context, the three-element *Mahon* formulation of a *prima facie* case makes little sense, as its third element—whether the employee was, in fact, discharged because of the

> disability—requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary. The five-element *Monette* formulation, on the other hand, properly tracks the formulation for a *prima facie* case used in *McDonnell Douglas* itself. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Further, *Monette* is cited for the formulation used in *Mahon*, and although *Monette* includes the three-element language, it is not used in the context of establishing a *prima facie* case for purposes of *McDonnell Douglas*, but is rather in the context of what is required for *recovery* under the ADA. *Monette*, 90 F.3d at 1179. Thus, it appears as though the *Mahon* court misread *Monette*. Because conflicts between published cases are resolved in favor of the earlier case, we adopt *Monette*'s five-element test for a *prima facie* case of employment discrimination under the ADA. *United States v. Allen*, 619 F.3d 518, 524 n.2 (6th Cir. 2010).

639 F.3d at 258-59. Since *Whitfield* was concerned with establishing a *prima facie* case with indirect evidence of discrimination, it has been limited to those instances. *See White v. Standard Ins. Co.*, 529 F. App'x 547, 549 (6th Cir. 2013); *Whitfield*, 639 F.3d at 259.

Despite the Court's clarification in *Whitfield*, the Sixth Circuit later published a case in which it relied on the three-factor *prima facie* case for disability discrimination. *Demyanovich*, 747 F.3d at 433. The *Demyanovich* decision made no reference to *Whitfield* or the five-factor *prima facie* standard. "It is firmly established that one panel of this court cannot overturn a decision of another panel; only the court sitting *en banc* can overturn such a decision." *United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000) (citation omitted) (emphasis added). Since the *Demyanovich* decision was not decided *en banc*, the five-factor test used in *Whitfield* and *Monette* is still controlling when indirect evidence is used to establish employment discrimination under the ADA.

As explained above, to succeed on an ADA claim based on indirect evidence of discrimination, the plaintiff must establish a *prima facie* case by showing the following: "(1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) [the employer] knew or

7

had reason to know of his disability; and (5) [the plaintiff] was replaced or his position remained open." *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 707 (6th Cir. 2015) (citing *Whitfield*, 639 F.3d at 259). The plaintiff may also satisfy the fifth element by showing that similarly situated non-disabled individuals were treated more favorably than the plaintiff. *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 n.2 (6th Cir. 2012) (citing *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999)). Once the *prima facie* case has been made, the employer bears the burden of showing a legitimate, nondiscriminatory reason for the employment action. *Whitfield*, 639 F.3d at 259 (citation omitted). The burden then reverts to the plaintiff to show that the employer's reason is pretextual. *Id.* (citation omitted).

If the claim is based on direct evidence of discrimination, the plaintiff must establish that he "(1) has a disability, and (2) is 'otherwise qualified' for the position, either '(a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Kempter v. Michigan Bell Tel. Co.*, 534 F. App'x 487, 490 (6th Cir. 2013) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)). The employer must then show that the job requirement is essential or that the accommodation requested would be an undue hardship on the employer. *Id.* at 491 (citing *Kleiber*, 485 F.3d at 869).

### A. The *Prima Facie* Case

Neither party has expressly argued that the Plaintiff's claim is based on direct evidence of discrimination. As such, it is treated as an indirect evidence case for purposes of the parties' cross-motions for summary judgment. Each motion for summary judgment, however, relies on the three-factor *prima facie* case earlier addressed and rejected. In particular, the parties disagree as to (1) whether the Plaintiff was "qualified" for purpose of the ADA and (2) whether the

8

Plaintiff suffered an adverse employment action because of his disability. The parties agree that (3) the Plaintiff is "disabled" for purposes of summary judgment.

As the Sixth Circuit clarified in *Whitfield*, those three factors are needed to eventually recover under an ADA claim; they do not constitute the *prima facie* case of disability discrimination. *Whitfield*, 639 F.3d at 258-59. The case law in this area is not entirely clear, and it is understandable that the parties fell on the other side of this thorny issue. For the time being, reliance is placed on *Whitfield* and *Monette*. Thus, while the parties have focused their energies on arguing the merits of the *prima facie* case, this Order will likewise do so but under the guidance of the five-prong standard.

**1. Whether the Plaintiff is Disabled**

For purposes of summary judgment, there is no dispute that the Plaintiff is "disabled" within the meaning of the ADA. (Docket Entry 22, p. 8). This element of the *prima facie* case is satisfied.

**2. Whether the Plaintiff is Qualified With or Without Reasonable Accommodation**

As defined in the Act, a "qualified individual" is a person who "can perform the essential functions of the employment position that such individual holds or desires" with or without reasonable accommodation. 42 U.S.C. § 12111(8). "Essential functions" of a job encompass "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). For instance,

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Id.* § 1630.2(n). When determining whether a function is "essential," the following evidence may be considered:

> (i)         The employer's judgment as to which functions are essential;
>
> (ii)       Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii)      The amount of time spent on the job performing the function;
>
> (iv)      The consequences of not requiring the incumbent to perform the function;
>
> (v)        The terms of a collective bargaining agreement;
>
> (vi)      The work experience of past incumbents in the job; and/or
>
> (vii)     The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3). This is typically a question of fact which should be reserved for the trier of fact and should not be resolved on a motion for summary judgment. *Keith v. Cty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013) (citation omitted).

The Defendant contends that the Plaintiff was not qualified to train and eventually become a substitute bus driver because the Plaintiff could not effectively perform emergency evacuation procedures. This raises the question, is the ability to perform an emergency evacuation procedure an essential function of the job? The answer is most likely yes, being able to safely evacuate a school bus in the event of an emergency is a fundamental aspect of the bus driver's job despite the fact that the need arises very rarely. The Giles County School System Transportation Handbook 2011-2012 emphasizes the importance of emergency evacuations and explains how to conduct these evacuations. (Docket Entry 24-1, p. 19-21). Ms. Busby testified that all bus drivers must complete three emergency evacuation drills annually. (Docket Entry 24-

1, p. 8). For purposes of this motion it is assumed, but not decided, that being able to complete emergency evacuation procedures is an essential function of a school bus driver's job.

Whether the Plaintiff could successfully complete emergency evacuation procedures in April 2013 is in genuine dispute.[3] According to the Defendants, Mr. Campbell instructed the Plaintiff on emergency evacuation procedures and noticed that the Plaintiff had difficulty completing the procedures and took longer than desired to complete the procedures. (Docket Entry 35 ¶ 5-7). As the Defendant pointed out, the Plaintiff alleged in his charge of discrimination and complaint that he had been required to train on evacuation procedures. (Docket Entry 1 ¶ 12) (Docket Entry 37-1, p. 4-5). The Plaintiff, on the other hand, denied receiving such training and stated that Mr. Campbell did not perform an evacuation drill with him. (Docket Entry 39-1 ¶ 2-6). The Plaintiff states that "[t]wo times on my own initiative but with Mikey Campbell present, I opened the back door of the bus and climbed in the bus from the ground with no assistance just to make sure I could physically do it, and I could." (Docket Entry 39-1 ¶ 7). The Plaintiff made similar statements during his deposition. (Docket Entry 30-10, p. 23). Additionally, the Plaintiff passed a DOT physical, one of the eligibility requirements for a school bus driver. Both parties agree that the Plaintiff was not given the opportunity to perform emergency evacuation procedures with a school bus full of children. (Docket Entry 43 ¶ 12). The parties provide two diverse series of events, one which would suggest that the Plaintiff could not perform the procedures and one in which the Plaintiff's abilities were not actually tested. Summary judgment is not the time to make credibility determinations or weigh the evidence. The Plaintiff's qualification for the position is in genuine dispute.

---

[3] The Plaintiff maintains that he did not require accommodations (Docket Entry 38, p. 2), so the issue is narrowed to whether the Plaintiff could perform the essential functions of the job in April 2013 without accommodations.

11

### 3. Whether the Plaintiff Suffered an Adverse Employment Action

The ADA applies to job training and the hiring process. 42 U.S.C. § 12112(a); *see Rosebrough*, 690 F.3d at 432 ("It cannot be disputed that the ADA covers individuals in training without regard to whether they are called employees, conditionally-hired employees, trainees, or a title specific to one employer."). While "[n]ot every action that the employee dislikes is an 'adverse employment action'" examples of adverse employment actions may include "termination of employment, a demotion in wage, salary or job title, a loss of benefits, or a decrease in responsibilities." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 462 (6th Cir. 2002) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) and *Crady v. Liberty Nat. Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)). The Plaintiff was terminated from the Defendant's job training program and was not hired by the Defendant. These employment actions are sufficiently adverse to satisfy this *prima facie* element.

### 4. Whether the Employer Knew or Had Reason to Know of the Plaintiff's Disability

Mr. Hickman made the decision to terminate the Plaintiff from the training program and declined to hire the Plaintiff. When the Plaintiff applied for the training program, he notified Mr. Hickman that he was disabled and was receiving disability benefits. This satisfies the fourth element of the *prima facie* case.

### 5. Whether Similarly Situated Individuals Were Treated More Favorably Than the Plaintiff

It appears most likely that the Plaintiff would have relied on the "similarly situated" method of establishing the fifth element of the *prima facie* case. This element is satisfied when another employee, who is similar to the plaintiff in the relevant aspects, was treated more

favorably than the plaintiff. *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 458 (6th Cir. 2004) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)).

The Plaintiff began the Defendant's training program around the same time as two other individuals, Joe and Penny Mitchell. The Mitchells eventually completed the training program and were later hired by the Defendant as substitute bus drivers. According to the Plaintiff, and not rebutted by the Defendant, one or both of the Mitchells were not required to perform emergency evacuation drills before completing the training program and being hired by the Defendant. (Docket Entry 42 ¶ 9) (Docket Entry 30-8). If this is the case and the Plaintiff was put through a more rigorous training program than the Mitchells, it would reasonably suggest that the Mitchells received more favorable treatment than the Plaintiff. Neither party addressed this element of the *prima facie* case, but the different training requirements may satisfy the Plaintiff's minimal burden at the *prima facie* level. *See Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008) (remarking that the "*prima facie* showing requirement is not onerous").

### 6. Conclusion

Neither party has established that summary judgment should be awarded in its favor. While both parties argue that the Plaintiff either has or has not satisfied the *prima facie* case of discrimination under the ADA, a genuine dispute of material fact exists as to whether the Plaintiff was a "qualified individual" within the meaning of the Act. On this basis, the cross-motions for summary judgment (Docket Entries 21 and 28) are **DENIED**.

## B. Failure to Mitigate

The Defendant argues that a damages award, if any, should be reduced because of the Plaintiff's failure to mitigate his damages. (Docket Entry 22, p. 12). The Plaintiff contends that the Defendant has waived this defense. (Docket Entry 38, p. 7).

Reviewing the Defendant's answer (Docket Entry 8), the Plaintiff is correct that the Defendant did not plead this affirmative defense. This is not altogether dispositive, however. A party's "failure to raise an affirmative defense by responsive pleading does not always result in waiver of the defense—such as, when the plaintiff receives notice of the affirmative defense by some other means." *Seals v. Gen. Motors Corp.*, 546 F.3d 766, 770 (6th Cir. 2008) (citation omitted). The Defendant had an opportunity to show that the Plaintiff had previously received notice of its intent to assert this defense. The Defendant did not respond to the Plaintiff's argument let alone present evidence of the Plaintiff's earlier knowledge. The Defendant has waived its right to assert the failure-to-mitigate defense.

It is so **ORDERED**.

s/ Joe B. Brown
Joe B. Brown
U.S. Magistrate Judge